CARLISLE PLASTICS, INC., Plaintiff,

v.

SPOTLESS ENTERPRISES, INC.,
and Spotless Plastics Pty.
Ltd., Defendants.

SPOTLESS ENTERPRISES, INC.
and Spotless Plastics Pty.
Ltd., Plaintiffs,

v.

CARLISLE PLASTICS, INC., Defendant.

Civil Action Nos. CV–94–1223(DGT),
CV–97–0427(DGT).

United States District Court,
E.D. New York.

Nov. 25, 1997.

As Amended February 26, 1998.

Kenneth P. George, Ira E. Silfin, Amster, Rothstein & Ebenstein, New York City, for Carlisle Plastics.

Kenneth L. King, Allen R. Morganstern, Patricia A. Wilcynski, Lydia T. McNally, Scully, Scott, Murphy & Presser, Garden City, NY, for Spotless Enterprises Incorporated and Spotless Plastics Pty. Ltd.

## OPINION AND ORDER

TRAGER, District Judge.

Plaintiff in the 1994 case, Carlisle Plastics, Inc. ("Carlisle" or "plaintiff") brought this action pursuant to 28 U.S.C. §§ 2201 & 2202 against Spotless Enterprises, Inc. and Spotless Plastics Pty. Ltd. ("Spotless" or "defendants") seeking a declaratory judgment that United States Patent No. 4,322,902 ("the '902 patent") is invalid. Plaintiff also sought a declaratory judgment that, in the event that the '902 patent is deemed valid, products made by plaintiff do not infringe the patent. Defendants counterclaimed, alleging patent infringement.

The original plaintiff in this action was Different Dimensions, Inc. ("DDI"). *See* Pl. Tr. Brief at 2. However, on April 15, 1997, Carlisle purchased DDI and acquired all of its assets, liabilities and ongoing business and was thereafter substituted for DDI in this action. *Id.* All of the products at issue in this case were DDI designs which Carlisle has represented that it will continue to market through its A & E Products Group ("A & E").[1] *See id.* at 2–3.

In 1997, Spotless commenced an action alleging that certain DDI (now Carlisle) products, which had not been part of the 1994 lawsuit, also infringed the '902 patent.

---

1. A & E is the largest producer of hangers in the United States. *See* Trial Transcript ("Tr.") at 63. Andrew Zuckerman, former president of DDI, is now president of A & E. *See id.*

This time, Carlisle counterclaimed, again seeking a declaratory judgment of invalidity of the '902 patent as well as non-infringement. Subsequently, all claims from the 1994 and 1997 actions pertaining to the '902 patent were consolidated for trial.

## Background

### A. The Origin of the Dispute

The '902 patent is entitled "Indicators for Garment Hangers." Trial Exhibit ("TX") 22, '902 Patent. In non-technical terms, the subject of the '902 patent is a garment hanger having an enlarged display portion extending above the top contour of the hanger hook, and a hollow device that fits over the enlarged display portion. The device is also known as an indicator, a size cap, or a top sizer because it is attached over the top of the hook of the hanger. See Def. Tr. Brief at 3–4. This indicator is usually color-coded and displays information about the garment on the hanger, such as its size. See Pl. Tr. Brief at 11–12; Def. Tr. Brief at 4. The use of a top sizer permits a consumer to scan a rack of garments and quickly find the size or variety desired, simply by looking at the top of the hanger hook. See Def. Tr. Brief at 4; Trial Transcript ("Tr.") at 191–92. Moreover, the top sizer system permits retailers both to arrange clothing according to size ("to zone") and to restock display racks efficiently. See Def. Tr. Brief at 5; Tr. 191–92.

The inventor of the '902 patent, Frank C. Lenthall, applied for the patent on April 16, 1979, and it was issued by the Patent and Trademark Office ("PTO") on April 6, 1982. See TX–22. Spotless, which acquired the right to the '902 patent in 1982, is currently the exclusive licensee of the patent, which will expire on April 16, 1999. See Pl. Tr. Brief at 11; Def. Tr. Brief at 3. In recent years Spotless has enjoyed considerable commercial success with the '902 patent. The combination of hanger and top sizers shown in the '902 patent has been sold in the United States to, inter alia, Target, Lowes and Wal–Mart, and over 500 million hangers and over 500 million size caps have been sold in the

last four years. See Def. Tr. Brief at 4 & 6 n. 5; TX–260; Tr. 199–200.

DDI (now subsumed by the A & E Group of Carlisle) has long been a market leader in the hanger and size cap industry, but DDI has historically manufactured hangers with a side sizer, which, as its name suggests, is a size indicator located on the side of the hanger hook rather than on the top. See, e.g., TX–222; Tr. 65. DDI and A & E, in a cross-licensing agreement, have sold billions of side size clips and hangers, making theirs the most popular indicator system in the world. See Tr. at 66. However, as the popularity of the top sizer system increased, DDI's side sizer system began to lose favor commensurately. For instance, due to the Spotless top sizer, DDI lost approximately one million dollars in business annually from K–Mart. See Tr. 121–22.

In 1993, in response to customer inquiries and demands, DDI began developing a top sizer system. In September of 1993, DDI furnished Spotless with a prototype of its hanger and top sizer, accompanied by a letter articulating that the prototypes did not infringe the '902 patent. See TX–179. Defendants responded that they did consider DDI's hanger and top sizer to be an infringement, but that Spotless would consider making DDI a licensee of the patent. No licensing agreement was ever consummated. See Def. Tr. Brief at 6. In the meantime, DDI had produced and offered for sale[2] a number of versions of its top sizing system. See Pl. Tr. Brief at 16–17; TX–115, TX–116, TX–117, TX–118, TX–106, TX–107, TX–33.[3] However, no customer agreed to purchase DDI's product, apparently fearing an accusation of patent infringement. See Pl. Tr. Brief at 16. Target requested and DDI provided an indemnification letter, but, nonetheless, Target declined to buy DDI's hangers and top sizers. See TX–40; TX–188; Pl. Tr. Brief at 16. Because DDI knew that it was no longer being considered as a possible licensee of the '902 patent, see TX–181, it commenced its

---

**2.** Note that a January 1, 1996 amendment to the Patent Act provides that the mere offer for sale of an infringing article constitutes an act of infringement. See 35 U.S.C. § 271.

**3.** Additional hangers and top sizers at issue in this litigation include: TX–153, TX–34, TX–35, TX–36, TX–37. See Pl. Tr. Brief at 17; Def. Tr. Brief at 7.

declaratory judgment action for invalidity and non-infringement on March 17, 1994.

On September 23, 1994, defendants applied to the PTO for reexamination of the '902 patent. This case was then stayed pending the issuance of the reexamination certificate. *See* Def. Tr. Brief at 7. The PTO produced this certificate on January 2, 1996. TX–23. On April 28, 1997, it was decided that there was "relation back" and thus that both the validity and infringement issues would be adjudicated with reference to the reexamined '902 patent, rather than the original '902 patent. *See* Def. Tr. Brief at 14.

### B. The Claims of the '902 Patent

Spotless claims that plaintiff's products infringe claims 1, 2, 17, 18 and 19 of the reexamined '902 patent. Claim 1 was deemed patentable with certain amendments; claim 2 is dependant on claim 1; claims 17, 18 and 19 were added in their entirety during the reexamination. *See* TX–23. The text of the claim 1, with the amendments effected during the reexamination in italics, is as follows:

1. In combination, a hanger for garments and other articles comprising:

a hook *having a top contour* adapted to engage a rail or other supporting means, said hook having an enlarged display portion extending from the hook such that it projects above the top contour of the hook; and

an indicating device *having a hollow body* attached to said display portion, *wherein at least a part of the display portion is received within the hollow body of said indicating device;* and said indicating device being readily visible when the hanger is in use by virtue of its position on said hook.

TX–23. Claim 2 is dependant on claim 1, and claims 17–19 are substantially similar to claim 1 except that they include the additional requirements that the hanger and indicator be made of molded plastic (both 17 and 18) and that the indicator be color coded (claim 18).[4]

All of these claims require that the hanger hook contain an "enlarged display portion." Plaintiff has consistently maintained that its products do not infringe the '902 patent because they lack an "enlarged display portion." *See* TX–179; Pl. Tr. Brief at 17; Tr. at 67. At trial, plaintiff's counsel acknowledged that if plaintiff's products did contain an enlarged display portion, then they would infringe the '902 patent. *See* Tr. at 512–13. Thus, the salient issue with respect to the infringement claim is what exactly comprises

---

4. The text is as follows:

2. The hanger of claim 1, wherein said indicating device has a body portion formed with means for releasably attaching the said body portion to said display *portion*.

17. *In combination, a molded plastic hanger for garments and other articles and a molded plastic indicating device, said combination comprising:*

*a hook having a top contour adapted to engage a rail or other supporting means, said hook having an integrally molded plastic flange which forms an enlarged display portion extending from the hook such that it projects above the top contour of the hook which engages said rail or other supporting means; and*

*said molded plastic indicating device which receives said molded plastic flange to attach said indicating device to said enlarged display portion, said indicating device being readily visible when the hanger is in use by virtue of its position on said hook.*

18. *In combination, a garment hanger and a color-coded size indicator which is readily visible when the hanger is in use, said combination comprising:*

(a) *a molded plastic garment hanger, said garment hanger having an integrally molded hook having a top contour to engage a rail or other supporting means;*

(b) *an enlarged display support integrally molded with said hook and extending upwardly from said hook above the top contour of the hook which engages said rail or other supporting means;*

(c) *a molded plastic size indicating device mounted on said enlarged display support, said device having a base and formed with a cavity defined within to receive said display support therewithin, said size indicating device being color coded and readily visible from all directions when the hanger is in use by virtue of its position on said hook; and*

(d) *means for releasably attaching said size indicating device to said enlarged display portion.*

19. *The hanger of claim 17, wherein said indicating device has a body portion formed with means for releasably attaching said body portion to said display portion.*

an "enlarged display portion" and whether plaintiff's products contain it. However, to resolve both this infringement issue, as well as the invalidity claim, it is necessary to analyze the prosecution history (or the "file wrapper") of the '902 patent.

### C. Prosecution History of the '902 Patent

#### (1)

When Frank C. Lenthall initially submitted his application to the PTO it contained 17 figures. *See* TX–60 at 5–24. In the course of the first office action, the patent examiner informed the inventor that the application actually contained five distinct inventions (or species), only one of which Lenthall would be permitted to prosecute. Species A was embodied in figures 1–4, species B was embodied in figures 5–7, species C was embodied in figures 8 and 9, species D was embodied in figures 10–13, and species E was embodied in figures 14–17. *See* TX–60 at 26; Tr. 290–93.

In this original submission to the PTO, the inventor promulgated a definition of the phrase "enlarged display portion" in the abstract by reference to figure 12, part of species D, of the application. Specifically, he stated: "[i]n the modification shown in Figures 12 and 13, the indicator is basically the same construction as the previous embodiment [figure 10] except that the hanger hook H is not formed with an enlarged display area A." TX–60 at 11. Figure 10 shows a hanger with a protuberance (which the defendants refer to as a "bump") on the side of the hanger hook and a sizer that fits on top of and totally overlaps the protrusion. *See* TX–60 at 19. Figure 12, by contrast, shows a hanger hook that is perfectly regular in shape, meaning that it lacks any protuberance and looks, quite frankly, like an unadulterated hanger hook. *See id.* The size indi-

cator fits over the entirety of the hanger hook in figure 12 but extends beyond, or hangs outside, the contour of the hook. *See id.* As will be discussed, plaintiff maintains that the protuberance comprises the "enlarged display portion," while defendants insist that it is not the protuberance, but a combination of other qualities that defines the "enlarged display portion."

Confronted with the dilemma of choosing among the five species contained in his original submission, the inventor decided to prosecute species E, which consisted of figures 14–17. The inventor canceled claims 1–14 (which described species A–D) and added claims 15–30. *See* TX–60 at 29–32. The examiner rejected new claim 15 on the basis of 35 U.S.C. § 102 as anticipated in light of the Ostroll patent,[5] and rejected new claims 16–22 on the basis of 35 U.S.C. § 103 as obvious in light of Ostroll in view of either the Bross patent[6] or the O'Keefe patent.[7] *See id.* at 36–37. The examiner withdrew from further consideration claims 23–30 "as not readable on the elected species." *Id.* at 36. Converted to plain English, this appears to mean that the claims were not encompassed within species E, the one the inventor chose to prosecute.

In response to this office action, the inventor canceled claims 15–22 and added new claims 31–40. *See* TX–60 at 43–45. Proposed claim 31, on which plaintiff relies for part of its non-infringement argument reads as follows:

> a hook adapted to engage a rail or other supporting means, said hook having a supporting means extending from the hook such that it projects above the top contour of the hook; and

> an indicating device attached to said supporting means, said indicating device

---

**5.** The Ostroll patent is TX–220. Ostroll shows (or "teaches") an indicator that is removeably secured to the hook of the hanger, but is positioned on the hook so that it is capable of being viewed from only one end of the hanger. *See* TX–220; TX–60 at 47.

**6.** The Bross patent is TX–212. Bross teaches a display card attached to a complex wire indicating guard that is then attached to a regular garment hanger.

**7.** The O'Keefe patent is TX–215. O'Keefe teaches a device that extends above the top of a wire hanger hook to prevent the entanglement of the hangers. In addition to the fact that O'Keefe is restricted by its construction to hangers with wire hooks, it also "only incidently suggest[s] ... that the device may be formed ... to receive identifying indicia of various types." TX–60 at 48.

comprising a body formed with a cavity having an entrance opening which receives said supporting means, said indicating device being readily visible from all directions when the hanger is in use by virtue of its position on said hook.

*Id.* at 43. In the corresponding office action, the patent examiner finally rejected claims 23–30 because they were dependent upon canceled claims, and rejected the new claim 31, quoted above, as obvious "over Ostroll in view of O'Keefe or Conger (TX–217)." TX–60 at 57. According to the examiner: "Ostroll shows the hanger hook provided a support member to receive an indicating element as in the proposed invention and to merely locate it at the top contour of the hook would be obvious from O'Keefe or Conger." *Id.* at 57. Claim 32 was rejected for the same reasons; claims 33–39 were objected to because they are dependent on a rejected claim; claim 40 was allowed. The inventor then had an interview with the examiner; they discussed the Ostroll, O'Keefe and Conger patents and decided that claim 31 would be amended "to structurally distinguish over references." *Id.* at 58.

In the next go around, the inventor added proposed claim 41, which harkened back to claim 23 (part of his first submission). This claim reads:

a hook adapted to engage a rail or other supporting means, said hook having an enlarged display portion extending from the hook such that it projects above the top contour of the hook; and

an indicating device attached to said display portion, said indicating device being readily visible when the hanger is in use by virtue of its position on said hook.

TX–60 at 60. As noted, original claim 23 had been dependent on claim 15 (which had been rejected on November 6, 1980 because of anticipation). *See id.* at 56–57.[8] Claim 23 originally provided: "[t]he hanger according to claim 15, wherein said hook is formed with

an enlarged display area at least adjacent the top of the hook, said display area being formed to releasably receive said indicating device." TX–60 at 31. Ultimately, the '902 patent was issued by the Patent and Trademark Office, with claim 41 appearing as claim 1 of the patent. *See* TX–22 at 5.

The inventor continued to press claims 31 and 32 (which did not contain the delimiting "enlarged display support" terminology). *See* TX–60 at 62–71. However, in an Advisory Action dated April 27, 1981, claims 31 and 32 were rejected, *see id.* at 71, and so the inventor finally abandoned these claims. *See id.* at 72–73.

To round out this history for purposes of claim construction, it is worth noting that the '902 patent cites six references to prior art, four of which become significant in this litigation. *See* TX–22 at 1. In the detailed description of the invention of the '902 patent, which was not altered upon reexamination, it is described as having one embodiment in which the indicator is in the form of a trapezium,[9] and:

In another aspect the invention provides a hanger adapted for use with an indicating device, said hanger being characterized by *an enlarged display area* attached to or forming part of the hanger and being visible when the garment is on the hanger, said display area being formed to detachably receive an indicating device which imparts information regarding the size and/or manufacturer and/or retailer and/or some other garment characteristics.

*Id.* at 4 (emphasis added). No further guidance is given in the original patent as to what constitutes an "enlarged display area."

(2)

The history of the '902 patent does not end here, however. For on September 23, 1994, in response to the instant litigation, defendant requested that the PTO reexamine the '902 patent. See TX–38 at 6–11. During

---

**8.** Although not inconsistent, it appears that claim 23 had been initially "withdrawn from further consideration as not readable on the elected species" on April 16, 1980. TX–60 at 36. It is unclear to the court why claim 23, after being withdrawn on April 26, was subsequently further

considered and rejected on November 6, 1980. *See id.* at 56–57.

**9.** This trapezium embodiment is not at issue in this case and thus has not been a part of this discussion.

the course of the reexamination, defendants proposed (and after protracted discourse with the examiner) were permitted to add claims 17, 18 and 19 to the patent, which are now being asserted against the plaintiff. *See id.* at 179–82. These claims essentially mirror claim 1, but add the requirement that the hanger and size cap be made of molded plastic.

Interestingly, however, the reexaminer initially determined that original claim 1 was rejected as being anticipated by Haimowitz, TX–208, being anticipated by Bruening, TX–209, being anticipated by Cohen, TX–211; claims 1 and 2 were rejected was being anticipated by Conger, TX–217; and claims 1–4 were rejected as being anticipated by Bross, TX–212. *See* TX–38 at 68–69. However, defendants amended these claims to include the requirement that the top sizer be hollow and be received by the enlarged display portion and they were thereafter accepted by the examiner. *See id.* at 129, 144. In addition, defendants had to amend claim 1 to include the requirement that the hanger have a top contour, so that there would be a proper antecedent for the reference to a top contour later in the claim. *See* TX–38 at 119–20; 144–45.

Defendants also sought to add a new claim 21, which provided:

[A] hook having a top contour adapted to engage a rail or other supporting means; and an indicating device having a hollow body formed to interengagingly receive a top portion of said hook; said indicating device being readily visible when the hanger is in use by virtue of its position on said hook.

TX–38 at 127. However, the examiner rejected this claim, stating that it enlarges the scope of the patent because it "does not include the limitation that the hook has an enlarged display portion" and because it is anticipated by O'Keefe, TX–215, and Richardson, TX–221. TX–38 at 143–44.

During the course of the reexamination of the '902 patent, the PTO examined the following United States patent documents: Cohen, Ostroll, McAuley, Montan, Haimowitz, Bruening, Stuppell, Cohen, Bross, Magnuson, Solow, O'Keefe, Morrish, Conger, Haggar,

Bachand, Ostroll, Richardson, Phillips, Johansson, Indelicato and Batts. *See* TX–23 at 1. The reexamination certificate was issued on January 2, 1996. *See id.*

## Discussion

### A. Validity of the '902 Patent

 When considering the validity of a patent, Congress has clearly instructed, in no uncertain terms that "[a] patent shall be presumed valid [and][t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. In order to meet this burden, plaintiff here must prove by clear and convincing evidence that the patent is invalid. *See, e.g., Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1427 (Fed.Cir.1988). In cases where a patent has undergone reexamination and been upheld by the PTO, the already-heavy burden placed on the challenger is amplified. *See Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir. 1985). Moreover, "courts have held that where a patent in suit has been reissued after the PTO's consideration of prior art cited by a challenger, the challenger's burden of proof in overcoming the presumption of validity in subsequent litigation 'has become more difficult to sustain—a fact [ ] to be taken into account by the trial judge.'" *E.I. Du Pont de Nemours & Co. v. Cetus Corp.,* 19 U.S.P.Q.2d 1174, 1179 (N.D.Cal.1990) (quoting *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1364 (Fed.Cir. 1984)). Thus, it is extremely legally significant that all prior art on which plaintiff relies to show invalidity was referred to in the '902 patent reexamination.

#### 1. Obviousness

Although the legal burden plaintiff faces is great, Carlisle, nevertheless, argues that claims 1, 2, 17, 18 and 19 of the '902 patent are invalid because they are obvious within the meaning of 35 U.S.C. § 103. This section provides that:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The Federal Circuit has construed section 103 to require inquiry into four criteria: 1) a determination of the scope and content of prior art; 2) a determination of the differences between the prior art and the claims at issue; 3) a determination of the level of ordinary skill in the pertinent art, and 4) a determination of which, if any, secondary considerations are relevant and what the effect is of those secondary considerations. *See. e.g., Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 447 (Fed.Cir.1986). Secondary considerations include long-felt need, commercial success, failed efforts of others, copying by others, requests for license by competitors, praise for the invention, and simultaneous development. *See* Def. Tr. Brief at 39; Herbert F. Schwartz, *Patent Law and Practice* 62–63 (2d ed.1995).

■ Plaintiff contends that claim 1 and dependent claim 2 are obvious in light of Haimowitz, TX–208, in view of Cohen, TX–204. Haimowitz teaches an indicating device extending above the top contour of a hook, while Cohen teaches an indicating device with a hollow body. According to plaintiff, "[i]t would be obvious to substitute the indicating device of Cohen for the indicating device of Haimowitz." Pl. Tr. Brief at 19.

Similarly, plaintiff argues that claim 17 is obvious because of Haggar, TX–218, in view of Phillips, TX–222, or Cohen, TX–204. Haggar presents a molded plastic hanger with an enlarged display portion; Phillips teaches a molded plastic sizer (which is designed to be a side sizer) and as already mentioned, Cohen teaches an indicator with a hollow body. Plaintiff maintains that "[i]t would be obvious to use the indicating device of either Phillips or Cohen in conjunction with the enlarged display portion of the hook of the hanger of Haggar." Pl. Tr. Brief at 20. Dependent claim 19 is obvious for the same reason, plaintiff argues. *See id.* at 20–21. Carlisle relies on the same prior art references to argue that claim 18, which requires a color-coded molded plastic sizer, is obvious. *See id.* at 21–22.

■ Defendants respond, and in my view correctly, that plaintiff's argument basically relies on impermissible "hindsight reconstruction." Def. Tr. Brief at 36. It is true, that by taking pieces of prior art, Carlisle can construct what the '902 patent embodies. However, the mere fact that, with the virtue of hindsight, one can assemble pieces of prior art to create the patented product, does not render that product obvious. It is only when the prior art, itself, suggests such a combination that the product will be considered invalid for obviousness. As the Federal Circuit has stated: "Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination." *In re Geiger,* 815 F.2d 686, 688 (Fed. Cir.1987) (citation omitted); *see In re Paulsen,* 30 F.3d 1475, 1482–83 (Fed.Cir.1994).

It is true, that with the benefit of hindsight, it is possible to cut and paste the prior art to form a composite that resembles the '902 patent. But what is striking and telling is that no one prior to Mr. Lenthall had so combined the elements, even though plastics had been readily available for some time. The immediate financial success of the product is further evidence of its originality and patentability. At trial, Spotless showed that the patent was a clear commercial success in terms of sales and market share, that DDI, one of Spotless's competitors, sought to become a licensee of the '902 patent, and that the vendors who purchase these hangers respected the '902 patent to such an extent that they would not purchase DDI's product due to fear of infringement. *See* TX–40.

In this case, plaintiff has failed to provide clear and convincing evidence of obviousness, especially in light of the heightened burden due to the reexamination of the '902 patent and the fact that all prior art cited by plaintiff was considered during such reexamination. Thus in consideration of these factors as well as the rather effective evidence cited above, plaintiff's claim of obviousness is rejected as predicated on present knowledge and innovation rather than true obviousness. Claims 1, 2, 17, 18, and 19 of the '902 patent are valid.

### 2. Specificity and New Matter

■ Plaintiff also argues that the '902 patent is invalid because it violates the mandate of 35 U.S.C. § 112 that the patent claims shall "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." Carlisle claims that because there is some dispute as to exactly what comprises the "top contour" of the hook as referred to in claims 1, 2, 17, 18, and 19, the '902 patent is invalid. Plaintiff claims that the top contour of the hook is, literally, the uppermost edge of the hanger hook, while defendants claim that the "*top contour* adapted to engage a rail" as amended during the reexamination, means that the top contour is the lower edge (i.e. the edge touching the rail) of the hook of the hanger. According to plaintiff, the existence of this ambiguity renders the claims invalid. *See* Pl. Tr. Brief at 22–23

Spotless responds that "[i]t is clear that the terms used in the '902 patent permit one of ordinary skill in the art to identify what is, and what is not, covered by the claims. The terms used in the '902 patent are terms that would be familiar to one of skill in the art, especially since they are used in other hanger/sizer patents." Def. Tr. Brief at 38. At trial, defendants' expert testified that the patent complied with the definiteness requirement of § 112. *See* Tr. at 386–87. Moreover, defendants note that during both the initial examination and the reexamination, the PTO never rejected the terms as indefinite. *See* Def. Tr. Brief at 38.

Plaintiff further contends that if Spotless's interpretation of the "top contour" is correct, then the reexamined '902 patent is invalid because it violates the rule enunciated in 35 U.S.C. § 132 that "[n]o amendment shall introduce new matter into the disclosure of the invention." Pl. Tr. Brief at 23–24. That is, if, as defendants urge, the top contour is really the portion of the hook that touches the rail, then the reexamination certificate introduced new matter when it added the phrase "top contour" to claim 1.

Spotless responds to this argument with the statement that "the examiner did not find that new matter was added during the reexamination." Def. Tr. Brief at 38. Addition-ally, defendants' expert testified that the reexamination did not incorporate new matter into the '902 patent. *See* Tr. at 386–87.

At first blush, these arguments do seem to present some rather thorny issues. However, both of plaintiff's arguments, relating to specificity and new matter, ultimately rest on a definition of "top contour" that was promulgated by defendants only for purposes of litigation. As explained in detail in the discussion of defendants' infringement claim (§ B, *infra*), this definition does not particularly make sense, and it seems evident that such definition was necessitated by defendants' infringement claim. In order to establish their claim that plaintiff's products infringe, defendants had to show that their hanger has "an enlarged display portion extending from the hook such that it projects above the top contour of the hook." TX–23. Thus, defendants were compelled to argue that the bottommost edge of the hanger hook was actually the "top contour." Had defendants conceded that the "top contour" was, in fact, the uppermost contour of the hanger hook, they would, in effect, have had to abdicate their infringement claim. This is because plaintiff's products do not have a protuberance that projects above the uppermost edge of the hanger hook. They do, however, have a portion that projects above the bottommost edge of the hanger hook. It seems, therefore, that in order to sustain the infringement claim, defendants found a new definition for the term "top contour."

In turn, plaintiff now attempts to hoist defendants by their own petard. And, to some extent, its arguments are compelling. But defendants should not be punished for a faulty argument they made for litigation purposes. The only basis that plaintiff has for its arguments lies in defendants' attempt to define the term "top contour" in a manner that supports their infringement claim. Had defendants never attempted to push this definition, the plaintiff would not have been able to make these arguments, and the validity of the patent could not have been contested on the grounds of lack of specificity or new matter. This belated effort on the part of the defendants has opened the door to an attack on their patent's validity, but this

alone does not provide clear and convincing evidence that the patent is invalid. Thus, plaintiff's arguments of invalidity on the basis of lack of specificity and new matter do not succeed here.

## B. Infringement of the '902 Patent

■ In order to determine whether a patent claim has been infringed, courts must engage in a two-part analysis: 1) the proper meaning and scope of the claim must be determined, and 2) the claim, as properly construed, must be compared to the allegedly-infringing product at issue. *See Nike Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed.Cir.1994).

### 1. Claim Construction

■ In order to engage in proper claim construction, courts must first look to the intrinsic evidence, i.e. the words of the patent claims themselves, the patent's specification and the prosecution history, to glean the meaning of claim terms. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). According to the Federal Circuit, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence [e.g. expert testimony]." *Id.* at 1583 (citations omitted)

■ "In construing a claim, claim terms are given their ordinary and accustomed meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise." *Nike Inc.,* 43 F.3d at 646 (citations omitted). It is an oft-repeated patent law maxim that an inventor may choose to be his own lexicographer and to give the terms in his claims special, uncommon meanings. *See, e.g., Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387–88 (Fed.Cir.1992). However, in order to vest a claim term with a special meaning (in contradistinction to its ordinary meaning) the inventor must "clearly state[ ] [the special definition of the term] in the patent specification or file history." *Vitronics Corp.,* 90 F.3d at 1582. Moreover:

> [T]he place to [specially define claim terms] is in the specification of the inventor's application, and the time to do so is prior to that application acquiring its own independent life as a technical disclosure through its issuance as a United States patent. The litigation-induced pronouncements of [the inventor], coming nearly at the end of the term of his patent, have no effect on what the words of that document in fact do convey and have conveyed during its term to the public.

*Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 889 (Fed.Cir.1984).

It should be noted that, in toto, this guidance somewhat begs the question of how precisely courts should determine a term's "ordinary and accustomed meaning" which is subsequently compared to some special meaning that may be vested in the claims, specification and file wrapper by the inventor. Courts seem to look to dictionary definitions for some semblance of clarity in the morass of semantic murkiness that penetrates claim construction. *See Nike Inc.,* 43 F.3d at 647 (describing with approval the use of a dictionary definition by the district court).

■ Recently the Federal Circuit has instructed that, although dictionaries constitute extrinsic evidence, "[j]udges are free to . . . rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp.,* 90 F.3d at 1584 n. 6; *see General American Transp. Corp. v. Cryo–Trans, Inc.,* 93 F.3d 766, 769–70 (Fed.Cir.1996) (describing with disapproval the use of a dictionary definition by the district court because it contradicted the definition provided by the prosecution history), *cert. denied, Cryo–Trans, Inc. v. General American Transp. Corp.,* —— U.S. ——, 117 S.Ct. 1334, 137 L.Ed.2d 493 (1997). That said, according to Webster's Third New International Dictionary, "enlarged" is defined as: "larger or greater than that formerly, usually, or normally present." Thus, it will be assumed that this is the usual and ordinary meaning of the term "enlarged" (as in "enlarged display portion"). Now it must be determined whether or not this definition is

consistent with that found in the claims, specification and prosecution history of the '902 patent.

Plaintiff urges that this usual definition is consistent with the intrinsic evidence. First, it argues that because claim 16 contains the term "display portion," then the use of the term "enlarged display portion" in claims 1, 2, 17, 18, and 19 goes to the issue of size and instructs that an enlarged display portion be bigger than a regular display portion. *See* Pl. Post Tr. Brief at 3–4 (noting that "each word in a claim must have some meaning") (citing *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed.Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996)).

Next plaintiff argues that the prosecution history reinforces, rather than contradicts, the usual meaning of the term "enlarged display portion." In his original application to the PTO, the inventor distinguishes figure 12 from figure 10 by noting that it describes "the same basic construction. except that the hanger hook H is not formed with an enlarged display area A." [10] TX–60 at 11, 19. In addition, plaintiff points out that during the reexamination of the '902 patent, the examiner cited five prior art references with what he contemplated as enlarged display portions: Haimowitz, TX–208, Bruening, TX–209, Cohen, TX–211, Conger, TX–217, and Bross, TX–212. *See* TX–38 at 68–69. All of these teach a display portion that is bigger, in either height or width, so that information can be displayed, than the usual shape of the hook. Thus, according to plaintiff, the intrinsic evidence supports the definition of "enlarged display portion" that requires some kind of protrusion, bump, or protuberance on the hanger hook.

Spotless, however, states an entirely different definition for the term "enlarged display portion," one having nothing to do with size per se. Spotless urges that an enlarged display portion actually has six features:

1) To be formed integrally with the hook of a hanger.

2) The hook has a top contour which is the surface of the hook that engages a rail that supports the hook.

3) The enlarged display portion projects above the top contour of the hook.

4) The enlarged display portion is received in the hollow body of an indicator in a releasable manner so the indicator is detachable but yet restrained against undesirable movement.

5) The enlarged display portion must be large enough to display the indicator so the indicator is visible, i.e. to be seen·and read by a normal customer when viewed from a normal distance and visible when the garment is on the hanger.

6) The enlarged display portion must be large enough, i.e. enlarged, to restrain against undesirable movement. In fact enlarged enough to inhibit movement of the indicator.

Def. Post Tr. Br. at 7–8. To justify this special definition, defendants point to the specifications of the '902 patent, arguing that they require only the above qualities, and not that there be any "enlargement" (in a deviating protuberance fashion) from a normal hook. *See* Def. Post Tr. Br. at 3–7.

■ Simply put, defendants' definition doesn't really work. In addition to the fact that this counterintuitive, special definition is not clearly stated in the claims, specifications, or prosecution history of the '902 patent, it also fails to account for the differentiation of "display portion" and "enlarged display portion." In spite of the fact that the inventor did not choose to prosecute species D, which contained figure 12 (whose only distinction from figure 10 is that it lacks the enlarged display portion), "through statements made during prosecution or reexamination an applicant for a patent or a patent owner... may commit to a particular meaning for a patent term, which meaning is then binding in litigation." *CVI/ Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed.Cir.1997). It is also noteworthy that in the CVI case, because the patents did not define the term "elasticity,"

---

**10.** It is agreed that portion and area mean the same thing here. *See* Def. Post Tr. Brief at 4 n.

9.

the Federal Circuit turned to the specifications and found that "the patent drawings are highly relevant in construing" the claim. *Id.* at 1153.[11]

Spotless promulgates an inventive, intelligent, but ultimately unpersuasive attempt to tailor claim language to meet the needs of present litigation. In many ways, its complexity alone betrays its failure. One of the principal purposes of a patent claim is to put the world on notice of one's invention, and "competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention." *Vitronics Corp.*, 90 F.3d at 1583 (citation omitted). A special definition that requires so intricate a twisting of claim and specification language fails to achieve the proper function of a definition within the patent law on a macro level.

Thus, plaintiff's urged definition of the phrase "enlarged display support" will be accepted for purposes of this litigation. Because this definition comes clearly from intrinsic evidence, it would be improper to consider extrinsic evidence, such as the testimony of defendants' expert, on this issue. *See Vitronics Corp.*, 90 F.3d at 1585 (finding that expert testimony regarding the proper construction of claims "may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur.")

### 2. Literal Infringement

To literally infringe a patent, every limitation set forth in an asserted claim must be present in the allegedly infringing product. *See Hi-Life Products, Inc. v. American Nat. Water–Mattress Corp.*, 842 F.2d 323, 325 (Fed.Cir.1988). The claim construction urged by plaintiff has been accepted here; according to such construction its products do not contain the protrusion that constitutes an enlarged display portion. Because plaintiff's products lack this enlarged display portion they do not literally infringe claims 1, 2, 17, 18, and 19 of the '902 patent.

### 3. Doctrine of Equivalents

The doctrine of equivalents provides that "an accused product that does not literally infringe a structural claim may yet be found an infringement 'if it performs substantially the same function in substantially the same way to obtain the same result' as the claimed product or process." *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (citation omitted)). The doctrine of equivalents was recently upheld by the Supreme Court in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, — U.S. —, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). In *Warner–Jenkinson Co.*, the Supreme Court held that the doctrine "must be applied to individual elements of the claim, not to the invention as a whole." *Id. at* —, *117 S.Ct.* at 1049. The salient inquiry for purposes of the doctrine is whether or not "the accused product or process contains elements identical or equivalent to each claimed element of the patented invention." *Id.* at —, 117 S.Ct. at 1054.

However, use of the doctrine of equivalents is limited by the doctrine of prosecution history estoppel (also known as file wrapper estoppel). This basically prevents a patentholder from arguing that a feature of an accused product is equivalent if the patentholder was compelled to surrender that feature during the prosecution history in order to obtain the patent. *See Jonsson v. Stanley Works*, 903 F.2d 812, 817 (Fed.Cir. 1990) (" [T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.") (internal quotations and citation omitted). In *Warner–Jenkinson Co.*, the Su-

---

**11.** Defendants have pointed out that the drawings are only illustrations and that they do not bind or supercede the claims. This is clearly true. *See* Def. Post Tr. Brief at 9 (citing *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed.Cir.1994)). But it does not mean that it is improper to analyze the patent drawings during the course of claim construction in order to grasp what the inventor was telling the PTO, and the world, about his invention.

preme Court created a presumption that, unless a reason unrelated to patentability is given by the PTO, file wrapper estoppel will apply to the doctrine of equivalents when the PTO has required an inventor to amend a claim. This presumption applies even when the PTO offers no explanation for requesting the amendment.

> Where no explanation is established, however, the court should presume that the PTO had a substantial reason relating to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element. The presumption we have described ... gives proper deference to the role of claims in defining an invention and providing public notice. . . .

*Warner-Jenkinson Co.,* —— U.S. at ——, 117 S.Ct. at 1051.

 Plaintiff and defendants naturally argue over whether or not the prosecution history reflects that the "enlarged display portion" was necessary to distinguish the '902 patent over the prior art, such that the patentholder cannot now claim that having a structure "equivalent" to the "enlarged display portion" constitutes infringement according to the doctrine of equivalents.

Defendants argue that the inclusion of "enlarged display portion" to claim 41 (which came from claim 23 and eventually became claim 1 of the original '902 patent) was not put in to distinguish over prior art. *See* Def. Post Tr. Brief at 22. Ultimately, according to defendants, patentability is not predicated "upon the enlarged display portion' but on a two-piece assembly, a hook and an indicator, with the indicator having a hollow body adapted to receive the 'enlarged display portion' in such a manner that the indicator was detachably and releasably received by the 'enlarged display portion' and in such a manner that the indicator was restrained against undesirable movement with movement of the indicator being inhibited." *See id.* at 23.

Plaintiff argues that the inclusion "enlarged display support" was absolutely necessary to the patentability of the claims. *See* Pl. Post Tr. Brief at 19–23. One example alone will suffice to show the correctness of

plaintiff's argument. Defendants sought, but were not permitted to add claim 21 during the reexamination of the '902 patent, which called for a hook with a top contour adapted to engage a rail and an indicating device with a hollow body formed to receive a portion of the hook and being readily visible by virtue of its position on the hook. *See* TX–38 at 127. It was not permitted to be added for the following reasons: 1) it enlarged the scope of the patent; 2) it was anticipated by O'Keefe; and 3) it was anticipated by Richardson. *See id.* at 143. According to the examiner, O'Keefe teaches a hanger with a hook, and an indicating device with a hollow body, *see id.,* and Richardson teaches a hanger having a hook and an indicating device with a hollow body which receives a top portion of the hook. *See id.* at 144. The only significant difference between reexamined claim 1 and proposed claim 21 is that claim 1 requires that the hook have "an enlarged display portion extending from the hook such that it projects above the top contour of the hook. . . ." TX–23 at 2. Thus, the fact that without the addition of the "enlarged display portion," (as evidenced in proposed claim 21), the claim would be entirely anticipated by two pieces of prior art, it is clear that the addition of "enlarged display portion" was vital to the patentability of claim 1. Thus file wrapper estoppel precludes defendants from arguing that plaintiff's products infringe the '902 patent under the doctrine of equivalents.

### Conclusion

For the reasons stated above, the '902 patent is hereby declared valid. It is also declared that plaintiff Carlisle's hangers and top sizers do not infringe the '902 patent. Because this is not considered an "exceptional case" neither party is entitled to attorney's fees pursuant to 35 U.S.C. § 285, as each party requested. The Clerk of the Court is directed to enter judgment in favor of Spotless Enterprises, Inc. and Spotless Plastics Pty. Ltd., declaring United States Patent No. 4,322,902 valid, and in favor of Carlisle Plastics, Inc., declaring that its hangers and top sizers do not infringe the patent.